LAGESEN, P. J.
*85 Defendant's mother was strangled to death with a telephone cord. Defendant denied responsibility, but a jury found that he *639 was the killer and convicted him of murder. The issue on appeal is whether the trial court erred when it permitted several witnesses to testify that the victim became reserved and unhappy after defendant moved in with her and seemed happier when defendant was not around. Defendant contends that the evidence was not relevant and that, if it was, its potential for unfair prejudice outweighed any probative value. We conclude that the trial court properly admitted at least some of the evidence and that, to the extent that it may have erred, the error was harmless in view of the properly admitted evidence.
I. BACKGROUND
In 2008, defendant moved in with the victim, who was in her seventies. In June 2010, the victim was strangled to death with a telephone cord in the kitchen of her home. Defendant called 9-1-1 requesting that a coroner and a police officer be dispatched to the home. When emergency responders arrived, they found the victim dead on the floor. Defendant was casual and unemotional when conversing with police and other emergency responders. Ultimately, defendant was arrested and charged with the victim's murder. Defendant pleaded "not guilty." He was tried and convicted, but, on appeal, we reversed his conviction because, in closing argument, the prosecutor had made a PowerPoint presentation to the jury that impermissibly urged it to infer defendant's guilt from his invocation of his constitutional right to remain silent. State v. Reineke , 266 Or. App. 299, 301, 309-10, 337 P.3d 941 (2014).
Defendant was retried on remand. At trial, the state built a circumstantial case against defendant. In addition to the evidence that defendant was living with the victim, the state presented evidence that (1) there was no forced entry into the house, and all the windows and sliding doors had dowels in the tracks; (2) the victim's cause of death was strangulation; (3) the telephone cord used to strangle the victim contained the DNA of defendant and the victim, none of *86 the telephones in the household were missing cords, and the amount of defendant's DNA on the cord was consistent with "long or extensive contact with the object"; (4) the victim's purse was by her feet in the kitchen with valuables inside and her diamond ring was still on her finger; (5) a few weeks before the killing, defendant, speaking in a vicious tone, told the victim that he could not wait for her to die so that he could get his inheritance; (6) defendant's wallet contained a list of telephone numbers that identified the victim as a "(Pain in the ass!)"; (7) defendant was casual and not emotional when interviewed following the victim's death; (8) some money was missing from a jar that the victim kept in her bedroom-a jar that typically contained the victim's emergency stash of cash and usually included some $ 2 bills; and (9) when officers searched defendant upon his arrest, they found a large roll of cash totaling $ 989 that included three $ 2 bills.
The state also introduced the evidence that is the subject of this appeal. Although defendant objected (at least in part), the state introduced testimony from the following witnesses about the victim's demeanor in the time since defendant had moved in with her, and in the weeks immediately preceding her murder:
• David Lind, the victim's son-in-law, testified that he had taken the victim to lunch a few weeks before her death and that "she was not her sparkly self. She was more reserved. More-I don't know-just she didn't seem to be her happy-go-lucky self." Lind said that the reason that he had taken the victim to lunch was to "beg her to have [defendant] move out."
• Warren Wies, a friend of the victim's, testified that he "could tell that something was really wrong" with the victim "a couple days before she died" and that "she just wasn't herself." He testified further that he had told her that she should tell defendant to move out.
• Sharon Long, the victim's daughter who lived out of state, testified that the victim's demeanor during their telephone conversations changed after 2008.
*87 Before 2008, the victim "would just chat and we would talk, and things were very relaxed." Then, after 2008, the victim "became more reserved, *640 more quiet, [and] made the phone conversations shorter."
• Joe Carrouth, the victim's son, testified that the victim "was a lot more reserved[ ] [and] a lot quieter" when defendant was around and "vivacious" out of his presence. Carrouth explained that he and his wife had visited the victim in May 2010 and, at the end of his stay, had told her that she needed to get defendant out of the house.
• Cindy Carrouth, Joe's wife, testified that, from her observations, the victim was "sad" and "nervous" when in defendant's presence. She testified further that between 2008 and May 2010, the victim "just had changed a lot and-* * * just real depressed-looking and just-she wasn't the same. She just didn't have the light that she had before and happiness." Cindy Carrouth was so upset by the victim's condition that she encouraged the victim to come with them to their home in Georgia.
Defendant's primary response, through cross-examination and closing argument, was to highlight the circumstantial nature of the state's case and to urge the jury to view the case as one in which the investigating officers had made a rush to judgment that defendant was responsible without conducting a thorough investigation. The defense did not present any affirmative evidence of its own. The jury unanimously found defendant guilty as charged.
On appeal, defendant assigns error to the trial court's admission of the evidence about the victim's demeanor. In his first assignment of error, defendant contends that the court erred in admitting evidence that the victim's demeanor changed after defendant moved in with her. In his second assignment of error, defendant asserts that the court erred in admitting evidence that the victim's demeanor changed in defendant's presence. Finally, in his third assignment of error, defendant argues that the court erred by admitting evidence that the victim's friends and family members, *88 responding to the victim's demeanor, advised her to move out or to have defendant move out.
In each instance, defendant argues that the challenged evidence was not relevant, OEC 401, and that, in all events, any probative value was substantially outweighed by the danger of unfair prejudice, OEC 403. Defendant argues further that the evidence likely affected the jury's verdict, asserting that the demeanor evidence was inflammatory and that the state's remaining evidence "was not so compelling as to render the error harmless." Defendant also argues that the evidence functioned as propensity evidence and that its admission deprived defendant of a fair trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution. In defendant's view, the evidence about the victim's demeanor invited the jury to infer that defendant's conduct caused that demeanor change and, for that reason, effectively constituted evidence that defendant had committed prior bad acts toward the victim. The evidence did so even though, in defendant's view, it was speculative to infer that the victim's demeanor changed as a result of anything that defendant had done. Defendant argues further that, to the extent that the trial court may have viewed the evidence as probative of a hostile relationship between the victim and defendant, it erred. In defendant's view, the fact that the victim may have felt hostility toward defendant does not imply that defendant felt the same way toward the victim.
The state's response is multifold. The state first contends that defendant did not preserve his first assignment of error, and also did not preserve any claim that the admission of the evidence violated his federal constitutional rights. With respect to the admission of the evidence identified in defendant's second and third assignments of error, the state initially argues that any error in admitting that evidence was harmless, in view of the other evidence admitted at trial. The state then argues that the trial court properly admitted the evidence under OEC 401 and OEC 403. In the state's view, evidence of the victim's demeanor was relevant to show that defendant and the victim had a hostile relationship, which, in turn, would permit the inference that defendant had a motive to kill her.
*641 *89 II. STANDARD OF REVIEW
At issue in this appeal are the trial court's relevancy rulings under OEC 401, and its rulings under OEC 403 that the probative value of the evidence at issue was not substantially outweighed by the danger of unfair prejudice. We review for legal error a trial court's determination that evidence is relevant under OEC 401. State v. Titus , 328 Or. 475, 481, 982 P.2d 1133 (1999). We review for abuse of discretion a trial court's decision to admit evidence over an OEC 403 objection. Id .
III. ANALYSIS
A. Preservation
We start with the question whether defendant's contentions on appeal are wholly preserved. We easily conclude that defendant's federal constitutional claims are not preserved. As defendant does not suggest that the trial court plainly erred in any respect, we do not consider those contentions any further.
The remaining issue is whether defendant preserved his contention that the trial court erred by admitting evidence that the victim's demeanor changed generally after defendant moved in. The state contends that defendant's objections extended only to (1) evidence that friends and family had told the victim to move out of the house and (2) evidence that the victim's demeanor changed in defendant's presence, and, thus, did not preserve his contention that the trial court erred by admitting evidence regarding the victim's general change in demeanor.
We agree with the state that, for the most part, defendant did not preserve his contention that the trial court erred in admitting evidence that the victim's demeanor changed generally after defendant moved in. Instead, with one exception, defendant's objections focused on the evidence that friends and family advised the victim that she or defendant should move out and on the evidence of how the victim's demeanor changed in defendant's presence. Indeed, at one point, defendant appeared to acknowledge that evidence about a general demeanor change would be admissible.
*90 Here is how the issue evolved before the trial court. Lind was the first witness from whom the state elicited testimony regarding the victim's demeanor change after defendant moved in and the associated advice regarding the need for either the victim or defendant to move out. Before Lind testified, defendant objected to the state eliciting a statement from Lind that he had "begged" the victim to have the defendant move out, on the grounds that the evidence was not relevant and was unfairly prejudicial. Defendant emphasized that Lind's "concern[ ] [for] his mother's well-being" was not probative of whether defendant murdered the victim and asked that it be excluded. The trial court overruled the objection, permitting Lind to testify that he had noted a change in the victim's demeanor shortly before her death and that he had taken her to lunch "to beg her to have [defendant] move out" because of his concern for the victim.
The next day, before calling additional witnesses, the prosecutor told the court that she intended to elicit similar testimony from other friends and family members of the victim. She explained that she intended to ask witnesses whether they had observed a demeanor change in the victim after defendant moved in and whether that demeanor change caused the witnesses to talk to the victim about having defendant move out. The prosecutor indicated that the testimony she intended to elicit from Joe Carrouth would involve a "slight variation." Because he had not observed a change in the victim's demeanor over time, she intended to elicit testimony from him about his observations of how the victim's demeanor changed when the victim was in defendant's presence, and how those observations caused him to encourage the victim to have defendant move out. In response, defendant asked for a continuing objection on the same grounds that the defense had objected to the testimony from Lind the previous day, stating that the record that had been made with respect to the Lind testimony was sufficient to support the continuing objection. The court agreed to grant the continuing objection, stating that "your objections, and the basis for your objections will be noted previously in regards to *642 Mr. Lind's testimony. * * * It'll be noted that that's essentially the basis that you're objecting *91 to." Defendant then sought clarification regarding the scope of permissible questioning about the victim's demeanor change, remarking that he thought it would "tak[e] it a little bit too far beyond there was a change in her demeanor" if witnesses were permitted to testify that the victim seemed afraid of defendant, suggesting that such testimony would be the equivalent of testimony that defendant was abusive to the victim. The court ruled that it was "fair game" for the witnesses to talk about their observations of the victim's behavior in front of defendant, as long as they limited their testimony to descriptions of her demeanor.
Those discussions did not alert the trial court that defendant was objecting to evidence about the victim's change in demeanor after defendant moved in with her; if anything, defendant's discussion of whether certain evidence would go "too far beyond" whether there was a change in the victim's demeanor would have affirmatively indicated to the court that defendant was not objecting to that type of evidence. For that reason, we conclude that defendant's first assignment of error is, in the main, not preserved.
As noted, there is one exception. As the state acknowledges, at one point when the prosecutor asked Cindy Carrouth whether the victim's demeanor had changed between 2008 and 2010, the defense stated, "we object again." The trial court overruled the objection. Although defendant did not state the specific grounds for the objection, given defendant's use of the word "again" and the earlier discussions regarding demeanor evidence, we conclude that defendant's objection adequately communicated to the court that defendant was objecting to the admission of that portion of Cindy Carrouth's testimony regarding the victim's change in demeanor between 2008 and 2010 under OEC 401 and OEC 403. Thus, we conclude that defendant's first assignment of error is preserved as to the admission of Cindy Carrouth's testimony about the victim's demeanor change over time in response to the objected-to question by the prosecutor.[1]
*92 B. Merits
Given our conclusion regarding the extent to which defendant's first assignment of error is preserved, the merits issue before us is whether the trial court properly admitted, over defendant's OEC 401 and OEC 403 objections, (1) the Carrouths' testimony about how the victim's demeanor changed in defendant's presence; (2) Cindy Carrouth's testimony about the victim's demeanor change between 2008 and 2010; and (3) the testimony from Lind, Wies, and the Carrouths about encouraging the victim to have defendant move out or to move out herself. We conclude that, at a minimum, the trial court properly admitted the Carrouths' testimony about how the victim's demeanor changed in defendant's presence and that any error in admitting any of the other challenged evidence was harmless.
The trial court properly admitted the evidence of the Carrouths' direct observations of the victim's demeanor in defendant's presence because that evidence was probative of the nature of the relationship between the defendant and the victim and it was not an abuse of discretion for the court to conclude that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. The evidence, as introduced, was not particularly inflammatory and would permit the inference that there was hostility between the victim and defendant, something that would give rise to a motive for defendant to kill her.
The Supreme Court long has recognized that this type of evidence is admissible in a prosecution for murder. It has explained that "[e]vidence of motive * * * is always admissible in prosecutions for murder" and "all evidence of whatsoever nature tending to throw light upon the relations existing between the accused and the deceased and the feeling between them is competent."
*643 State v. Finch , 54 Or. 482, 488-89, 103 P. 505 (1909) ; see also State v. Flett , 234 Or. 124, 126-28, 380 P.2d 634 (1963) (explaining the relationship between relevance and admissibility in homicide cases and noting the "slight probative value" of evidence with some small tendency to illuminate the relationship between the defendant and the victim). In particular, "[e]vidence that shows a hostile relationship existed between a defendant *93 and his victim tends to shed light on a defendant's mens rea " and is pertinent in a murder case, given that "[t]he state ha[s] the burden to prove beyond a reasonable doubt that defendant's acts were intentional." State v. Moen , 309 Or. 45, 68, 786 P.2d 111 (1990).[2] Here, the trial court did not err or abuse its discretion in admitting the Carrouths' direct observations of how defendant's presence affected the victim's demeanor.
Whether the remaining evidence at issue in defendant's preserved assignments of error was properly admitted is not as clear because that evidence does not speak directly to the nature of the relationship between the victim and defendant in a nonspeculative, objective way but is more indicative of the witnesses' subjective beliefs about the relationship. However, we do not address that question because the admission of that evidence, even if erroneous, was harmless, in view of the evidence that was properly admitted or was admitted without challenge. Erroneously admitted evidence is harmless if it had little likelihood of affecting the jury's verdict. State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003). In evaluating whether the erroneous admission of evidence is harmless, "we consider any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue to assess whether the jury would have found the evidence to be duplicative, cumulative, or unhelpful in its deliberations." State v. Chandler , 278 Or. App. 537, 541, 377 P.3d 605, rev. den. , 360 Or. 568, 385 P.3d 82 (2016) (internal quotation marks omitted).
Here, even if the trial court erred by admitting evidence that witnesses advised the victim to move out or have defendant move out because of their perceptions of the victim's demeanor change, or by admitting the objected-to testimony of Cindy Carrouth, that evidence did not add much that was new, or particularly probative, to the evidence that was properly before the jury on the issue of defendant's relationship with the victim. We have concluded that the court *94 correctly admitted the evidence about the Carrouths' observations about how the victim's demeanor changed in defendant's presence. Apart from the objected-to testimony of Cindy Carrouth, the testimony from Lind, Wies, and Long, and the unobjected-to portion of Cindy Carrouth's testimony about the victim's general change in demeanor between 2008 and 2010, also was properly before the jury because defendant did not raise any objection to it. In addition, the jury was presented with more direct (and inculpatory) evidence of the hostile relationship between the victim and defendant, including that defendant told the victim a few weeks before her death that he could not wait for her to die so that he could get his inheritance and that he referred to her as a "Pain in the ass" on the list of phone numbers in his wallet. In view of all of that evidence, it is likely that the jury perceived the challenged evidence as either cumulative of the other admitted evidence addressing the nature and degree of hostility in the relationship between the victim and defendant or, in the case of the evidence that friends and family advised the victim that either she or defendant should move out, as not particularly helpful, in view of the other, directly probative evidence on the point.
Affirmed.

The state points out that, shortly before the objected-to testimony, Cindy Carrouth had testified, without objection, that the victim had seemed "happy and jolly" over the telephone before defendant moved in and that she observed a change in demeanor that coincided with defendant moving in with the victim, in that the victim started to sound "kind of sad."

Although the evidence at issue in Moen was of other acts by the defendant, we do not understand the court's explanation of why evidence of a hostile relationship between the victim and the defendant is relevant in a homicide case to turn on whether the evidence at issue involved other acts.